607 A.2d 1255

EILEEN VOORHEES, PLAINTIFF–RESPONDENT, v.
PREFERRED MUTUAL INSURANCE COMPANY,
DEFENDANT–APPELLANT.

Argued February 4, 1992—Decided June 17, 1992.

168

*Anthony P. Pasquarelli* argued the cause for appellant (*Methfessel & Werbel,* attorneys).

*Francis X. Garrity* argued the cause for respondent (*Garrity, Fitzpatrick, Graham, Hawkins & Favetta,* attorneys; *Francis X. Garrity* and *Rudolph G. Morabito,* on the brief).

*David J. D'Aloia* submitted a brief on behalf of *amicus curiae,* National Association of Independent Insurers (*Saiber, Schlesinger, Satz & Goldstein,* attorneys; *David J. D'Aloia, Joan M. Schwab,* and *Mary Fran Farley,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The primary issue in this appeal is whether a homeowner's insurance policy providing coverage for bodily injuries caused by the insured will cover liability for emotional distress accompanied by physical manifestations. We hold that it will. Further, we hold that the event causing the distress will be deemed an accidental occurrence entitling the insured to coverage when the insured's actions, although intentional, were not intentionally injurious.

I

In the underlying suit, filed in 1985, Eileen Voorhees was sued by her child's teacher for her comments questioning the teacher's competency and fitness. The complaint against Voorhees indicates that Voorhees and other parents had ex-

pressed their concern about the teacher at an open school-board meeting and had requested that their children be removed from her class. The school board decided to relieve the teacher of her teaching duties pending the results of a psychiatric examination. Local newspapers published stories regarding the controversy. The teacher alleged that

[t]he January 17, 1985 issue of *The Cranford Chronicle*, one of the defendant newspapers in this case, quotes the defendant, Eileen Voorhees, as speaking for the parents of some of the school children of the plaintiff and as saying that she, Eileen Voorhees, was glad the Board of Education had finally "done something." The article goes on to quote the defendant, Eileen Voorhees, as having stated, "We have been warning them since September that there were serious problems which should be investigated. I'm just sorry it took an incident like the one on December 10 to convince them."

After the psychiatric examination, the schoolteacher was considered fit to resume teaching, and did so at a special assignment.

The teacher sued Voorhees, the local Board of Education, the Superintendent of Schools, the school principal, the local newspapers, and one other parent seeking compensation for the injuries she had suffered due to their behavior. Count four of the complaint, concerning Voorhees and the other parent, alleged that

[a]t various times and on various dates * * * defendants [other parent] and Eileen Voorhees made false and erroneous statements about the competency and fitness of the plaintiff, such statements serving to place plaintiff before the public in a false light, further serving to interfere with her rights of privacy and to inflict upon her humiliation, embarrassment, emotional distress and mental anguish. The statements as well as conduct of these defendants respecting the plaintiff herein were made and carried out willfully, deliberately, recklessly and negligently. Moreover, these defendants knew or should have known that their statements about plaintiff were false and would probably, as occurred, place plaintiff before the public in a false light, interfere with her rights of privacy, cause her severe humiliation, embarrassment, emotional distress and mental anguish.

As a direct and proximate result of the foregoing, plaintiff was damaged in her reputation as a professional teacher and has been unable and remains unable to function in her customary teaching assignment. Moreover, she has been placed before the public in a false light, has had her rights of privacy interfered with and has suffered and continues to suffer embarrassment, humiliation, emotional distress and mental anguish.

The teacher alleged that the parents' accusations and the school system's response caused her extreme emotional distress. Medical evidence generated in response to interrogatories revealed that the emotional distress associated with the events had resulted in "an undue amount of physical complaints," including "headaches, stomach pains, nausea, * * * [and] body pains * * *."

Voorhees was insured under a homeowners policy issued by Preferred Mutual Insurance Company. That policy obligated the insurer to

pay * * * all sums for which any *insured* is legally liable because of *bodily injury* * * * caused by an *occurrence* to which this coverage applies[, and to] defend any suit seeking damages, provided the suit results from *bodily injury* * * * not excluded under this coverage.

In its definitions section, the policy stated that

*Bodily injury* means bodily harm, sickness or disease to a person including required care, loss of services and death resulting therefrom.

*       *       *       *       *       *       *       *

*Occurrence* means an accident * * *.

The policy excluded coverage for "liability * * * caused intentionally."

Voorhees requested Preferred Mutual to defend her against the schoolteacher's suit. The carrier refused on two grounds: one, that the policy expressly excluded coverage for liability created by intentional acts; and two, that the teacher's claim sounded in libel and/or slander, causes of action that result in "personal" rather than "bodily" injury claims, and are therefore not covered under the policy.

The underlying case settled for $750 in August 1987. Voorhees alleges she spent more than $14,000 defending the suit. In September 1988, Voorhees filed this suit against Preferred Mutual for damages for breach of the insurance contract. Both parties moved for summary judgment.

The trial court granted Preferred Mutual's motion. The trial court quickly disposed of Preferred Mutual's first contention, that the policy excluded coverage for liability resulting from

intentional acts, by noting that the complaint alleged not only intentional conduct but also negligent conduct, which would be covered. However, the trial court agreed with Preferred Mutual's second contention that the complaint alleged defamation, a cause of action not covered under the bodily-injury policy. The court based its decision on *Lumbermen's Mutual Casualty Co. v. United Service Automobile Ass'n*, 218 *N.J.Super.* 492, 528 *A.*2d 64 (App.Div.1987), which held that a defamation claim is not covered under a bodily-injury policy.

The Appellate Division reversed. 246 *N.J.Super.* 564, 569, 588 *A.*2d 417 (1991). A majority of the court disagreed with the trial court's conclusion that the complaint alleged only defamation and not alternative causes of action including outrage and the negligent infliction of emotional distress, *id.* at 570–71, 588 *A.*2d 417, causes of action that would be covered under the phrase "bodily injury." *Id.* at 573, 588 *A.*2d 417. Although the allegations were far from convincing, the court noted that "[i]f the pleadings state facts bringing the injury within the coverage of the policy, the insurer must defend regardless of the insured's ultimate liability to the complainant." *Id.* at 569, 588 *A.*2d 417.

The dissenting judge below strongly disagreed with the majority's position that emotional-distress claims fall within an insurer's duty to defend under a policy covering liability for bodily injuries. Noting that an ambiguous insurance policy is to be interpreted in line with the policyholder's "reasonable expectations," the dissent indicated that the term "bodily injury" is unambiguous and thus can and should be given its ordinary meaning. *Id.* at 583–84, 588 *A.*2d 417 (Deighan, J.A.D., dissenting). That ordinary meaning, he argued, would preclude coverage for the essentially-emotional injuries alleged in the present case. *Id.* at 588, 588 *A.*2d 417. The dissent also found that under Voorhees' policy, which defined an occurrence as an accident, there had been no occurrence because verbal

statements such as Voorhees' do not constitute an "accident." *Id.* at 588–89, 588 *A.*2d 417.

This appeal is here as of right.[1]  *R.* 2:2–1(a)(2).

## II

### *Interpreting the Complaint*

The dispute centers on whether the complaint alleges a covered claim.  Preferred Mutual argues that the complaint sets forth only one cause of action, for defamation.  Because such a claim is not based on a plaintiff's personal distress and humiliation, but is based instead on the harm to the plaintiff's relations with others—the harm to the plaintiff's "relational" interest—it is not covered by a bodily-injury policy.  *Lumbermen's Mutual, supra,* 218 *N.J.Super.* at 494, 498–99, 528 *A.*2d 64.  Voorhees, on the other hand, alleges that the complaint sets forth various alternative causes of action, among them outrage and the negligent infliction of emotional distress, both of which fall within the policy's coverage.

"[T]he duty to defend comes into being when the complaint states a claim constituting a risk insured against." *Danek v. Hommer,* 28 *N.J.Super.* 68, 77, 100 *A.*2d 198 (App. Div.1953), *aff'd o.b.,* 15 *N.J.* 573, 105 *A.*2d 677 (1954).  Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit.  *Id.* 28 *N.J.Super.* at 76–77, 100 *A.*2d 198.  If the complaint is ambiguous, doubts should be resolved in favor of the insured and thus in favor of coverage.

---

[1] The majority of the Appellate Division also addressed two other issues: the apportionment of defense costs between covered and noncovered claims, 246 *N.J.Super.* at 580, 588 *A.*2d 417, and Preferred Mutual's duty to defend in view of their potential conflict of interest with Voorhees in characterizing Voorhees' acts as intentional rather than negligent.  *Id.* at 577, 588 *A.*2d 417.  Neither of these issues was addressed by the dissent.  We therefore need not and do not address them.

*Central Nat'l Ins. Co. v. Utica Nat'l Ins. Group*, 232 *N.J.Super.* 467, 470, 557 *A.*2d 693 (App.Div.1989). When multiple alternatives causes of action are stated, the duty to defend will continue until every covered claim is eliminated. *Mt. Hope Inn v. Travelers Indem. Co.*, 157 *N.J.Super.* 431, 440–41, 384 *A.*2d 1159 (Law Div.1978). As one court has stated:

> To hold otherwise would be to place upon the insured the burden of demonstrating in advance of the underlying litigation which of the competing theories of recovery against it was applicable for purposes of insurance, thereby frustrating one of the basic purposes of such a clause in the insurance. contract—protection of the insured from the expenses of litigation.
>
> [*Solo Cup Co. v. Federal Ins. Co.*, 619 *F.*2d 1178, 1185 (7th Cir.1980).]

■ That the claims are poorly developed and almost sure to fail is irrelevant to the insurance company's initial duty to defend. The duty to defend

> is not abrogated by the fact that the cause of action stated cannot be maintained against the insured either in law or in fact—in other words, because the cause is groundless, false or fraudulent. Liability of the insured to the plaintiff is not the criterion; it is the allegation in the complaint of a cause of action which, if sustained, will impose a liability covered by the policy.
>
> [*Danek v. Hommer, supra*, 28 *N.J.Super.* at 76–77, 100 *A.*2d 198.]

■ There is little dispute that the complaint was inartfully drafted. It does not clearly articulate the facts necessary to prove any specific cause of action. The duty to defend, however, is determined by *whether* a covered claim is made, not by how well it is made. A third party does not write the complaint to apprise the defendant's insurer of potential coverage; fundamentally, a complaint need only apprise the opposing party of disputed claims and issues. *Jardine Estates, Inc. v. Koppel*, 24 *N.J.* 536, 542, 133 *A.*2d 1 (1957); *Miltz v. Borroughs–Shelving*, 203 *N.J.Super.* 451, 458, 497 *A.*2d 516 (App.Div.1985).

■ As written, the complaint alleges outrage and negligent infliction of emotional distress just as convincingly or unconvincingly as it does defamation. It states that Voorhees made statements "serving to * * * inflict upon her humiliation, embarrassment, emotional distress and mental anguish," and that Voorhees' conduct was "willfull[ ], deliberate[ ], reckless[ ], and

negligent[ ]." The complaint notified Preferred Mutual that plaintiff would argue multiple, alternative causes of action, potentially including, but not limited to, defamation.

## III

### A. *General Principles of Policy Interpretation*

Because we conclude that the complaint alleged intentional and negligent infliction of emotional distress, the next question is whether that allegation is covered under a bodily-injury policy. Generally, an insurance policy should be interpreted according to its plain and ordinary meaning. *Longobardi v. Chubb Ins. Co.*, 121 *N.J.* 530, 537, 582 *A*.2d 1257 (1990). But because insurance policies are adhesion contracts, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness. *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 335, 495 *A*.2d 406 (1985). When the meaning of a phrase is ambiguous, the ambiguity is resolved in favor of the insured, *id.* at 336, and in line with an insured's objectively-reasonable expectations. *DiOrio v. New Jersey Mfrs. Ins. Co.*, 79 *N.J.* 257, 269, 398 *A*.2d 1274 (1979). Moreover, if an insured's "reasonable expectations" contravene the plain meaning of a policy, even its plain meaning can be overcome. *Werner Indus. v. First State Ins. Co.*, 112 *N.J.* 30, 35–36, 548 *A*.2d 188 (1988). Nonetheless, courts " 'should not write for the insured a better policy of insurance than the one purchased.' " *Longobardi, supra,* 121 *N.J.* at 537, 582 *A*.2d 1257 (quoting *Walker Rogge v. Chelsea Title & Guar. Co.*, 116 *N.J.* 517, 529, 562 *A*.2d 208 (1989)).

### B. *Interpreting "Bodily Injury"*

Voorhees' homeowner's-insurance policy requires Preferred Mutual to defend her against any suits alleging "bodily injury," defined as "bodily harm, sickness or disease." Authorities dispute whether emotional-distress injuries are covered under bodily-injury insurance policies.

The terms of that dispute focus on two primary considerations: (1) whether the term "bodily injury" is ambiguous and should thus be construed against the insurer; and (2) whether finding coverage for emotional distress under a bodily-injury policy would conflate the coverage provided by bodily-injury policies with the broader coverage traditionally provided by personal-injury policies.

Many of the courts addressing the ambiguity of the phrase "bodily injury" in light of claims for emotional distress have done so in all-or-nothing terms, ignoring the specific nature of the injuries alleged and the context in which they occurred. We believe that one cannot evaluate the "ambiguity" of a phrase like "bodily injury" in a vacuum. Whether the term is ambiguous depends on the context in which it is being used.

In the present case, the schoolteacher's alleged emotional injuries resulted in certain physical consequences, including nausea, headaches, and the like. This case thus requires us to address the "ambiguity" of the phrase "bodily injury" in the context of emotional injuries that have led to physical consequences. We thus reserve the discussion of its ambiguity when emotional distress does not result in physical consequence for our companion case, *SL Industries v. American Motorists Insurance Co.*, 128 *N.J.* 188, 607 *A*.2d 1266 (1992). The trilogy of recent Appellate Division cases deciding that latter question are hence inapposite in the present case. *See Wolfe v. State Farm Insurance Co.*, 224 *N.J.Super.* 348, 540 *A*.2d 871 (App. Div.1988), *certif. denied,* 111 *N.J.* 654, 546 *A*.2d 562 (1988); *Lumbermen's Mutual, supra,* 218 *N.J.Super.* 492, 528 *A*.2d 64; *NPS Corp. v. Insurance Co. of North America,* 213 *N.J.Super.* 547, 517 *A*.2d 1211 (App.Div.1986).

A significant number of courts have held that when emotional distress results in physical manifestations, it is covered under a bodily-injury policy. For example, in *Holcomb v. Kincaid,* 406 *So*.2d 646 (La.Ct.App.1981), the plaintiff in the underlying action alleged that the insured's fraudulent marriage to her had

caused emotional distress resulting in a "rash, falling hair, weight loss, and symptoms of a stroke." *Id.* at 648. The court held that the term bodily injury was ambiguous and should thus be construed against the insurer, *ibid.*, and that those physical manifestations "appear to fit within the policy definition of bodily injury * * *." *Id.* at 649. *See also Kufalk v. Hart,* 636 *F.Supp.* 309, 311, 312 (N.D.Ill.1986) (holding that emotional distress leading to bodily injuries including, among others, high blood pressure, headaches, stomach pains, and diarrhea constitutes bodily injury within coverage of policy); *Employers Casualty Ins. Co. v. Foust,* 29 *Cal.App.*3d 382, 105 *Cal.Rptr.* 505, 508 (1972) (holding that allegation that parents suffered emotional distress resulting in physical symptoms from watching accident involving their child triggers coverage under bodily-injury policy); *McGuire v. American States Ins. Co.,* 491 *So.*2d 606, 608 (Fla.Dist.Ct.App.1986) (holding that where insured's actions caused "mental distress, headaches, and muscle spasms which required treatment and medication" they could "be construed as a bodily injury involving 'sickness and disease' "). *But see Dahlke v. State Farm Mut. Auto. Ins. Co.,* 451 *N.W.*2d 813, 815 (Iowa 1990) ("We think the term 'bodily injury' is clear on its face and does not include the physical manifestations of the parents' " emotional distress.).

Even a number of jurisdictions denying coverage for emotional distress unaccompanied by physical symptoms have noted that if plaintiff had alleged physical symptoms, the duty to defend would have been triggered. *See Aim Ins. Co. v. Culcasi,* 229 *Cal.App.*3d 209, 280 *Cal.Rptr.* 766, 773–74 (1991); *Albin v. State Farm Mut. Auto. Ins. Co.,* 498 *So.*2d 171, 174 (La.Ct. App.), *writ denied,* 498 *So.*2d 1088 (1986); *Greenman v. Michigan Mut. Ins. Co.,* 173 *Mich.App.* 88, 433 *N.W.*2d 346, 349 (1988); *Farm Bureau Mut. Ins. Co. v. Hoag,* 136 *Mich.App.* 326, 356 *N.W.*2d 630, 633 (1984); *Artcraft v. Lumbermen's Mut. Casualty Co.,* 126 *N.H.* 844, 497 *A.*2d 1195, 1196 (1985).

We conclude that the term "bodily injury" is ambiguous as it relates to emotional distress accompanied by physical manifes-

tations. That ambiguity should be resolved in favor of the insured. *Sparks, supra,* 100 *N.J.* at 336, 495 *A.*2d 406. Moreover, we find such an interpretation to be in accord with the insured's objectively-reasonable expectations. That "emotional distress can and often does have a direct effect on other bodily functions" is well recognized. *NPS Corp., supra,* 213 *N.J.Super.* 547, 553, 517 *A.*2d 1211. An insured who is sued on account of an injury involving physical symptoms could reasonably expect an insurance policy for liability for bodily injuries to provide coverage.

A number of courts, like the dissent in the Appellate Division, 246 *N.J.Super.* at 584, 588 *A.*2d 417, also rest their conclusion that emotional distress can never be considered a bodily injury on the observation that personal-injury policies, which often explicitly include emotional injuries, are broader than bodily-injury policies. *See Rolette Co. v. Western Casualty and Surety Co.,* 452 *F.Supp.* 125, 130 (D.N.D.1978); *Aim Ins. Co. v. Culcasi, supra,* 280 *Cal.Rptr.* at 775; *Presidential Hotel v. Canal Ins. Co.,* 188 *Ga.App.* 609, 373 *S.E.*2d 671, 672 (1988); *Allstate Ins. Co. v. Diamont,* 401 *Mass.* 654, 518 *N.E.*2d 1154, 1156 (1988); *Artcraft v. Lumbermen's Mut. Casualty Co.,* 126 *N.H.* 844, 497 *A.*2d 1195, 1196 (1985).

*Amicus curiae,* the National Association of Independent Insurers, relies heavily on that reasoning. It argues that bodily-injury policies should be interpreted narrowly in order to maintain the distinction between bodily- and personal-injury policies. Unless bodily-injury policies are limited to purely physical injuries, *amicus* argues, every bodily-injury policy will be converted into a "personal injury" policy, providing insureds with coverage they neither expected nor desired. As a consequence, plaintiffs will allege emotional distress with consequent physical manifestations at every opportunity in order to reach the insurers' deep pockets. The price of homeowners' policies covering bodily injury will increase drastically and consumers will be forced to buy coverage they would rather not own.

*Amicus* overstates the consequences of our interpretation of the phrase "bodily injury." Personal-injury policies generally, although not exclusively, provide coverage for specific *causes of action*, such as defamation or false arrest, rather than for general categories of *injuries. See* 7A *J.A. Appleman, Insurance Law and Practice* § 4501.14, at 286 (Berdal ed. 1979); *Lumbermen's Mut., supra*, 218 *N.J.Super.* at 498–99, 528 *A.*2d 64. Thus, the two types of policies will remain distinguishable despite coverage for at least some claims of emotional distress under a bodily-injury policy. And although a few plaintiffs may be tempted to assert emotional distress with accompanying physical manifestations more often, that will not necessarily obligate insurers to undertake unbounded duties to defend and indemnify. When an emotional distress claim is not supported factually, the insurer can and should move to dismiss the meritless claims.

We conclude, therefore, that "bodily injury" encompasses emotional injuries accompanied by physical manifestations. Here the injured party's emotional distress resulted in physical manifestations. Attached to the schoolteacher's answers to interrogatories was a medical report by a psychiatrist who had examined the teacher. In his report the doctor states that the teacher had informed him that she suffered from "headaches, stomach pains, nausea, depression, and body pains." The doctor found such physical complaints "real" and consistent with the teacher's emotional distress allegations. We note that the physical manifestations necessary to trigger coverage under a "bodily injury" policy do not, *per se*, demonstrate the severe emotional distress necessary to sustain a claim for the infliction of emotional distress. *Cf. Buckley v. Trenton Saving Fund Soc'y*, 111 *N.J.* 355, 366–69, 544 *A.*2d 857 (1988) (discussing level of injury necessary to sustain tort claim for infliction of emotional distress). We are defining the term "bodily injury" under insurance law, not tort law.

Because the teacher demonstrated that she was suing Voorhees for bodily injuries incurred as a result of her emotional distress, Preferred Mutual was obligated to defend her unless and until the physical ailments were disproved or the underlying allegations were dismissed.

### C. *Interpreting "Occurrence"*

By indicating that the duty-to-defend clause, unlike the indemnification clause, does not require the existence of an occurrence, the majority of the Appellate Division did not reach the issue of whether Voorhees' actions constituted an occurrence. 246 *N.J.Super.* at 570, 588 *A.*2d 417. We agree with the dissent that, implicitly, the duty-to-defend clause will not be triggered absent a potentially-coverable occurrence. 246 *N.J.Super.* at 582, 588 *A.*2d 417 (Deighan, J.A.D., dissenting). The duty to defend applies to all suits for bodily injury "not excluded under this coverage." According to the policy, if a bodily injury were not caused by an occurrence, Preferred Mutual would not have to indemnify the insured. Liability for the injury would thus be "excluded" from coverage, and no duty to defend would arise. *See also Burd v. Sussex Mut. Ins. Co.,* 56 *N.J.* 383, 388–89, 267 *A.*2d 7 (1970) (duty to defend applies only to those injuries for which there would be duty to indemnify if claim were valid). Thus, Preferred Mutual will be required to defend Voorhees against the allegations of infliction of emotional distress only if Preferred Mutual would have to indemnify her if liability is found, a circumstance that would be true only if the injuries were caused by an event that could be deemed an "occurrence."

The insurance policy defines an occurrence as an "accident." In essence, the insurance company limits its coverage to accidental occurrences to preclude coverage for insureds whose conduct is intentionally-wrongful.

The jurisprudence interpreting insurance provisions that implicate the question of the extent of coverage for intentional acts demonstrates a careful balance between competing

doctrines. On the one hand, we have long held that public policy denies insurance indemnification for the civil consequences of wrong-doing. *Ruvolo v. American Casualty Co.*, 39 *N.J.* 490, 496, 189 *A.*2d 204 (1963); *Malanga v. Manufacturers Casualty Ins. Co.*, 28 *N.J.* 220, 225, 146 *A.*2d 105 (1958). On the other hand, we recognize the desire to compensate victims with insurance proceeds to the extent that that compensation will not condone and encourage intentionally-wrongful conduct. *Ambassador Ins. Co. v. Montes*, 76 *N.J.* 477, 483, 388 *A.*2d 603 (1978). As we stated in *Burd v. Sussex Mutual Insurance Co.*, *supra*, in interpreting a policy exclusion for intentional injuries:

> The exclusion of intentional injury from coverage stems from a fear that an individual might be encouraged to inflict injury intentionally if he was assured against the dollar consequences. Pulling the other way is the public interest that the victim be compensated, and the victim's rights being derivative of the insured's, the victim is aided by the narrowest view of the policy exclusion consistent with the purpose of not encouraging an intentional attack. And the insured, in its own right, is also entitled to the maximum protection consistent with the public purpose the exclusion is intended to serve. [56 *N.J.* at 398–99, 267 *A.*2d 7 (citations omitted).]

We must thus interpret the terms "occurrence" and "accident" in a manner that is both consistent with the reasonable meaning of the insurance contract and responsive to the above policy concerns.

The key interpretive question is what should be deemed "accidental": the *act* or the *injuries* resulting from the act? The dissent in *Voorhees* stresses that an "accident" is a fortuitous event, occurring without human agency, or, if human agency is involved, an event entirely unusual and unexpected. The dissent concludes that statements causing emotional distress cannot be deemed an "accident," thus implying that no intentional act can be deemed an occurrence. 246 *N.J.Super.* at 588–89, 588 *A.*2d 417 (Deighan, J.A.D., dissenting).

In contrast, New Jersey's lower courts generally focus on the accidental nature of the resulting *injury.* In *Lyons v. Hartford Insurance Group*, 125 *N.J.Super.* 239, 310 *A.*2d 485 (App.Div.1973), *certif. denied*, 64 *N.J.* 322, 315 *A.*2d 411 (1974),

Lyons had fired a shot, killing a man, and sought coverage for the liability resulting from his act. His insurance policy defined an occurrence as "an accident." In reversing the lower court's conclusory dismissal based on the absence of an occurrence, the court stated: "The general rule is that coverage exists * * * for the unintended results of an intentional act, but not for damages assessed because of an injury which was intended to be inflicted." *Id.* 125 *N.J.Super.* at 245, 310 *A.*2d 485.

Most recently, the lower courts have confronted the meaning of "accident" in the context of interpreting pollution-exclusion clauses, which prohibit coverage for pollution unless it is sudden or accidental. In *Jackson Township v. Hartford Accident and Indem. Co.*, 186 *N.J.Super.* 156, 451 *A.*2d 990 (App.Div. 1982), the court stated that the policy language "sudden and accidental" "can be interpreted as simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the *injury* was 'neither expected nor intended.'" *Id.* at 164, 451 *A.*2d 990 (emphasis added). *Accord Broadwell Realty v. Fidelity & Casualty Co.*, 218 *N.J.Super.* 516, 534, 528 *A.*2d 76 (App.Div.1987); *Summit Assocs. v. Liberty Mut. Fire Ins. Co.*, 229 *N.J.Super.* 56, 63, 550 *A.*2d 1235 (App.Div. 1988). *But see John's Cocktail Lounge v. North River Ins. Co.*, 235 *N.J.Super.* 536, 542, 563 *A.*2d 473 (App.Div.1989) (determining that wrongful discharge constitutes "intentional" rather than accidental occurrence, court deemed irrelevant manner in which act had been done and resulting injury).

In evaluating whether intentional statements can be considered accidental occurrences, other jurisdictions have split. Some hold that tortious statements do not constitute an occurrence because the *act* of speaking is intentional. *See, e.g., Keating v. National Union Fire Ins. Co.*, 754 *F.Supp.* 1431, 1440 (C.D.Cal.1990) (agreeing with insurer's contention that "statements are always intentional"); *Presidential Hotel v. Canal Ins. Co., supra,* 373 *S.E.*2d at 673 (insured's intentional acts of sexual harassment and fraud do not constitute "occur-

rence"); *Greenman v. Michigan Mut. Ins. Co.*, 173 *Mich.App.* 88, 433 *N.W.*2d 346, 349 (1988) (because occurrence does not include intentional acts, allegation of sexual harassment cannot be occurrence).

Other jurisdictions, focusing on the accidental nature of the injury, have held that intentional statements leading to unintentional injuries can be deemed an occurrence. In *International Insurance Co. v. West American Insurance Co.*, 208 *Cal. App.*3d 117, 255 *Cal.Rptr.* 912 (1989), homeowners sued a savings and loan institution for its misrepresentations concerning a building contractor's competence. The bank requested defense of the suit from its insurer. The court stated that

[e]ven assuming intent, in the sense that [the defendant] intended to make the statements attributed to him, "[t]he fact that an act which causes an injury is intentional does not take the consequences of that act outside the coverage of a policy which excludes damages unless caused by accident *for if the consequence that is the damage or injury is not intentional and is unexpected it is accidental in character." [Id.* 255 *Cal.Rptr.* at 918 n. 3 (emphasis added) (quoting *Meyer v. Pacific Employers Insurance Co.*, 233 *Cal.App.*2d 321, 43 *Cal.Rptr.* 542, 547 (1965)).]

*See also Universal Underwriters Ins. Co. v. Youngblood*, 549 *So.*2d 76, 78 (Ala.1989) ("The innocent or reckless aspects of the misrepresentation claims present a sufficient basis to support * * * a duty to defend.").

We adhere to the prevalent New Jersey rule and hold that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is "accidental," even if the act that caused the injury was intentional. That interpretation prevents those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm.

Even if the operative question is the intent to injure rather than to act, the question of what constitutes an "intent to

injure" remains. The key issue is whether the court must find a subjective intent to injure, or whether it can presume an intent to injure from the objective circumstances. In that regard, our inquiry parallels that taken in interpreting policy exclusions for intentional acts. Those exclusions preclude coverage for injuries expected or intended by the insured. Case law interpreting those policy exclusions, in addition to that interpreting the definition of "occurrence," is thus relevant.

■ The general trend appears to require an inquiry into the actor's subjective intent to cause injury. Even when the actions in question seem foolhardy and reckless, the courts have mandated an inquiry into the actor's subjective intent to cause injury. *See Garden State Fire & Casualty Co. v. Keefe*, 172 *N.J.Super.* 53, 410 *A*.2d 718 (App.Div.1980) (when defendant claimed he intended to shoot warning, not to cause injury, court, stressing importance of compensating victim, said question of intent to injure still needed resolution despite earlier guilty plea to assault), *certif. denied*, 84 *N.J.* 389, 420 *A*.2d 317 (1980); *Lyons, supra*, 125 *N.J.Super.* at 247, 310 *A*.2d 485 (when defendant claimed that he intended to shoot as warning, not to kill, court said coverage can be determined only by analyzing whether defendant intended injury).

■ When the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind. The Appellate Division adopted an objective test in *Atlantic Employers v. Tots & Toddlers*, 239 *N.J.Super.* 276, 571 *A*.2d 300 (App.Div.), *certif. denied*, 122 *N.J.* 147, 584 *A*.2d 218 (1990), where the insured was sued for his sexual abuse of children in a day-care center. The court noted the general rule that coverage exists " 'for the unintended results of an intentional act * * *.' " *Id.* 239 *N.J.Super.* at 281, 571 *A*.2d 300 (quoting *Lyons, supra*, 125 *N.J.Super.* at 245, 310

*A.*2d 485). Nonetheless, the court, citing several out-of-state decisions holding that sexual assault of children is so inherently injurious that it can never be an accident, held that "[a]s a matter of public policy and logic * * * the better rule warrants application of the objective approach," *id.* at 283, 310 *A.*2d 485, according to which the intent to injure would be presumed from the performance of the act. *Ibid.*

██ Absent exceptional circumstances that objectively establish the insured's intent to injure, we will look to the insured's subjective intent to determine intent to injure. Voorhees' actions were a far cry from the type of egregious behavior that justified an objective approach in *Atlantic Toddlers* and thus do not justify a departure from the general rule requiring an inquiry into the insured's subjective intent to injure.

Although Voorhees' statements were unquestionably intentional, there is little evidence that she intended or expected to injure the schoolteacher. Our impression is that she was motivated by concern for her child rather than by a desire to injure the teacher. Regardless of our impressions, the complaint itself included an allegation of negligent infliction of emotional distress. An allegation of negligence presumes the absence of an intent to injure. Preferred Mutual thus had the duty to defend until the negligence claim had been dismissed.

██ Moreover, the duty to defend also may have been triggered by the claim for intentional infliction of emotional distress, known as "outrage" in New Jersey. Although "outrage" is considered an intentional tort, it is recognized not only where conduct is intentional but also where it is "reckless." *Buckley, supra,* 111 *N.J.* at 366, 544 *A.*2d 857. A "reckless" act under tort law does not meet the subjective intent-to-injure requirement under insurance law. Therefore, under both the "negligent infliction of emotional distress" and the "outrage" allegations, Preferred Mutual had a duty to defend unless and until a subjective intent to injure had been demonstrated.

## IV

We affirm the judgment of the Appellate Division directing the Law Division to enter judgment in favor of plaintiff.

CLIFFORD, J., dissenting.

One might well ask, with much scratching of the head, "What's going on here?" A suit that the majority correctly labels "groundless," *ante* at 174, 607 *A.*2d at 1259, settles for $750 and in the process produces a claim of over $14,000 in legal fees? Our energies would be better expended in ensuring that such nonsense not recur than in searching for ways to visit liability on a homeowner's insurance carrier for that kind of a tab.

And search the Court must, because the policy at issue here is limited to coverage for "bodily injury," which plainly does not cover claims of purely emotional distress arising from allegedly false and erroneous statements made by the insured. If that kind of protection is available at all, it is in the form of "personal injury" coverage, designed specifically to protect against liability, otherwise within the four corners of the policy, for those kinds of damages.

Although the issue is not directly posed by this appeal, as a threshold matter I very much doubt that the allegations against Voorhees meet the stringent requirements for a claim of intentional infliction of emotional distress, also known as the tort of "outrage." We recently held in *Buckley v. Trenton Saving Fund Society*, 111 *N.J.* 355, 544 *A.*2d 857 (1988), that to establish that tort, a plaintiff must show that the defendant acted intentionally or recklessly; that the defendant intended both to do the act and to produce emotional distress; that the defendant's conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' "; and that " 'the emotional distress suffered by the plaintiff [was] so severe that no

reasonable man could be expected to endure it.' " *Id.* at 366, 544 *A.*2d 857 (quoting *Restatement (Second) of Torts* § 46 (1965)). The claim against Voorhees as set forth in the Complaint filed in the suit against her, see *ante* at 170, 607 *A.*2d at 1257, does not begin to assert the foregoing elements. Rather, to the extent that one can put a label on it, the claim smacks of defamation, for which there can be neither coverage nor a duty to defend under Voorhees' homeowner's policy. *Lumbermen's Mut. Casualty Co. v. United Servs. Auto. Ass'n*, 218 *N.J.Super.* 492, 528 *A.*2d 64 (App.Div.1987) (holding emotional-distress claims caused by defamation not covered by standard homeowner's policy).

That aside, I agree entirely with Judge Deighan, dissenting below, 246 *N.J.Super.* 564, 581, 588 *A.*2d 417 (1991), that "the term 'bodily injury' in the insurance contract contemplates injury to the *physical* components of the body, not to solely subjective nonphysical mental suffering," *id.* at 583, 588 *A.*2d 417, and that "the term 'accident' or 'occurrence' in an insurance policy does not include 'false and erroneous *statements*' [that] interfere with rights of privacy" and cause severe humiliation, embarrassment, emotional distress, and mental anguish, to the detriment of one's reputation. *Ibid.*

I would reverse and reinstate the judgment for defendant.

*For affirmance* —Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN— 6.

*For reversal* —Justice CLIFFORD—1.