**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1843-24

MAHIMA JOISHY,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

CHUBB INSURANCE COMPANY
OF NEW JERSEY,

      Defendant-Respondent/
      Cross-Appellant,

and

FEDERAL INSURANCE
COMPANY, INC., CHUBB INA
HOLDINGS INC., CHUBB GROUP
HOLDINGS INC., CHUBB
LIMITED, PETRA
CONSTRUCTION &
MANAGEMENT LLC, and
ALEXANDER DUQUE, a/k/a
ALEXANDER DUQUE-SALAZAR,

      Defendants-Respondents.

_____

Argued March 5, 2026 – Decided March 18, 2026

Before Judges Mawla, Marczyk, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-0597-20.

Gene Markin argued the cause for appellant/cross-respondent (Stark & Stark PC, attorneys; Gene Markin, of counsel and on the briefs).

Thomas A. Morrone argued the cause for respondent/cross-appellant (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Thomas A. Morrone and John V. Mallon, of counsel and on the briefs; Thomas R. Lloyd, on the briefs).

PER CURIAM

A jury found plaintiff Mahima Joishy had no cause of action against defendant Chubb Insurance Company of New Jersey regarding her insurance coverage claims, resulting in the entry of judgment in defendant's favor on February 7, 2025. Plaintiff appeals from March 17, 2022 orders, which denied her cross-motion for summary judgment, and a May 2, 2022 order denying her subsequent motion for reconsideration. Defendant cross-appeals from: a March 17, 2022 order denying its motion for summary judgment; a May 2, 2022 order denying its motion for reconsideration; and a November 9, 2023 order denying its motion in limine related to plaintiff's failure to secure an expert to prove her claim for additional living expenses. We affirm.

Around 2011, plaintiff purchased a homeowner's insurance policy from defendant to insure her condominium, which she renewed in subsequent years. Her 2014-2015 policy had various coverage limits, including $56,000 for replacement of her home's contents; $10,000 for mold remediation; and $229,700 for additions and alterations. The additions and alterations provision was explained under a section entitled "Extra Coverages," and reads, in part, as follows:

> **Additions and alterations**
> This coverage is in effect only if an amount of coverage greater than zero is shown in the [c]overage [s]ummary for your [a]dditions and alterations.
>
> We cover your building additions, alterations, fixtures, improvements, installations or items of real property that are part of your unit as defined in the [m]aster [d]eed. This includes breakage of glass or safety glazing material in the building, or a storm door or window. We also cover any other structure on the condominium property that is:
> - owned by you; or
> - available for your exclusive use and which you are required to insure.
>
> For a covered loss to these items, we will pay up to the amount of coverage shown in the [c]overage [s]ummary for [a]dditions and alterations.

Also located under Extra Coverages was a provision entitled "Additional living expenses," which, in part, provides:

3

As described below, under certain conditions when your condominium unit cannot be lived in because of a covered loss to your condominium unit or, if applicable, its contents, we provide coverage for additional living expenses which consists of extra living expenses, loss of fair rental value and forced evacuation expenses. There is no deductible for this coverage.

**Extra living expenses.** If a covered loss makes your condominium unit uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the kenneling of domestic animals not primarily owned or kept for business use. We cover this increase for the reasonable amount of time required to restore your condominium unit to a habitable condition, or if you or members of your household permanently relocate, the shortest amount of time required to settle elsewhere. However, if you are constructing additions, alterations, or renovations to your condominium unit at the time of a covered loss, we only cover the increase in your normal living expenses incurred by you for the reasonable amount of time required to restore the condominium unit to the condition it was in prior to the covered loss. This period of time is not limited by the expiration of this policy.

Plaintiff's 2015-2016 renewal contained the same extra living expenses provision, but also stated a covered loss is covered up to the earlier of "the reasonable amount of time required to restore the condominium unit to a habitable condition" or "two years from the date of loss, or a later date if agreed to by us."

4

The policy contained a "Rebuilding to code" provision, also listed under Extra Coverages, which, in part, read:

> After a covered loss to covered property, we cover the necessary cost of conforming to any law or ordinance that requires or regulates:
> - the repair, replacement, or rebuilding of the damaged portion of your additions and alterations made necessary by the covered loss;
> - the demolition, replacement, or rebuilding of the undamaged portion of your additions and alterations necessary to complete the repair, replacement, or rebuilding of the damaged portion of your additions and alterations; or
> - the demolition of the undamaged portion of your additions and alterations when your condominium unit must be totally demolished.

On June 15, 2015, a broken pipe caused water damage to plaintiff's condominium, which rendered it uninhabitable. Defendant concluded the loss was covered under plaintiff's 2014-2015 renewal policy but also honored the modified extra living expenses language contained in the 2015-2016 renewal.

During the summer of 2015, defendant paid for rental furniture for plaintiff since some of her furniture was damaged. Plaintiff also hired a mold remediation company in September 2015, which defendant agreed to pay for in November 2015.

Plaintiff contacted construction companies in early 2016. In April 2016, the condominium association passed a resolution requiring all units to "replace

5

the plastic toilet supply lines." During this time, the mold remediation company discovered asbestos. In June 2016, defendant contacted the condominium association requesting clearance to begin work on the rebuild. Defendant declined to renew plaintiff's policy around October 2016. On December 16, 2016, defendant agreed to extend the extra living expenses coverage to June 2017.

In early 2017, plaintiff met with at least two construction contractors. Defendant notified plaintiff that its estimate of $39,486.36 for the reconstruction was sufficient, but it would have a claims adjuster meet with plaintiff's contractor to review issues pertaining to the scope of the rebuild.

Plaintiff retained an architect approved by defendant to draft and submit rebuild plans to the condominium association in February 2017, as required by the association's bylaws. On February 24, 2017, defendant notified plaintiff the full scope of damages was estimated at $82,451, and the architect's proposal recommended many alterations unrelated to the loss, which were not covered.

The architect submitted his plans to the association and began to solicit contractors' bids between March and May 2017. He recommended Petra Construction & Management for the reconstruction. Petra agreed to a scope of work with defendant in June 2017. Following an inspection with defendant's

A-1843-24

representative, Petra claimed defendant agreed additional work was needed because of "code compliance and current site conditions."

Plaintiff and the association argued over certain aspects of the design. In January 2018, the association approved the rebuild plans, and Petra began construction. The work was to be completed by May 9, 2018.

In February 2018, Petra paused work because it found asbestos. The association refused to cover the asbestos remediation. In June 2018, defendant approved an asbestos remediator, who completed the remediation in August 2018. Afterwards, Petra informed defendant it needed additional funds due to wall damage caused by the asbestos remediator.

Plaintiff and Petra signed an amended contract in September 2018. Defendant disbursed some funds but found the remainder of the amounts sought were excessive and beyond plaintiff's policy coverage limit. In October 2018, defendant notified plaintiff her additions and alterations coverage limit was exhausted and issued her a final payment. Around December 2018, defendant advised plaintiff it would stop paying her extra living expenses because the rebuild should have been completed by then. Defendant inspected the work done between October and December 2018, and informed plaintiff that Petra

7

was not completing the work as required by the contract. As a result, defendant refused to pay Petra additional funds, and Petra halted work.

In early 2019, defendant's representative met with the architect and Petra to discuss the reasons for the reconstruction delay, which Petra blamed on cost increases. Defendant also made two past-due rent payments for plaintiff's temporary housing. In January 2019, defendant hired its own construction expert who prepared a report showing the rebuild should have been completed within four months of its initiation. As a result, defendant refused to provide further coverage. It noted plaintiff's coverage limits were exhausted and the extra living expenses coverage was met since it voluntarily paid them for two years after plaintiff's loss. Plaintiff constructed her own timeline to highlight what she perceived as defendant's delays and to show her efforts to ensure the condominium was rebuilt. In August 2019, defendant provided a statement of loss, showing it paid $580,343.06 on the claim.

In February 2020, plaintiff sued defendant alleging: breach of contract; breach of the implied covenant of good faith and fair dealing; bad faith; and breach of fiduciary duty. During discovery, plaintiff, two of defendant's claims adjusters, and the architect were deposed.

8

Each party moved for summary judgment. Their motions were denied on October 30, 2020. The court found there were genuine issues of material fact regarding "whether . . . [p]laintiff [wa]s entitled to further payments."

In June 2021, the architect provided a letter to plaintiff detailing the deficiencies in Petra's work. The letter indicated while the demolition and framing job were seventy percent complete, the overall job was incomplete.

Plaintiff was deposed in August 2021. She explained the condition of the condominium had not substantially changed since January 2019. The mold remediation company she hired demolished all the walls and removed any mold it discovered. Plaintiff met with several contractors to determine what the rebuild would cost. She noted, initially, defendant and one of the contractors could not agree on the scope or cost of the rebuild.

Plaintiff testified mold was found in a wall cavity, which was a problem throughout the condominium complex and resulted in the association hiring a contractor to clean out those areas. The association notified defendant the issue was unrelated to the loss.

Plaintiff acknowledged defendant had disbursed $37,000 to her in 2015. Although she had no construction experience, she learned from a friend who was a contractor the sums defendant offered to pay for the loss were inadequate.

Plaintiff testified defendant's refusal to renew the policy in 2016 was improper and created a hardship. Although she believed a contractor other than the one approved by defendant would have successfully completed the job, she acknowledged defendant did not limit her choice of contractors she could hire. She also acknowledged defendant continued to cover her living expenses following the non-renewal.

Plaintiff delegated the hiring of the contractor to her architect and later met with Petra's owner once defendant and Petra had agreed on a scope of work. She testified although Petra was hired in the summer of 2017, it did not begin the rebuild until January 2018. Plaintiff blamed the condominium association for the delay. She conceded defendant agreed to pay for the asbestos removal.

Although defendant alerted plaintiff she had exhausted her additions and alterations coverage after it paid her an additional $11,000 for Petra's work, plaintiff disputed the coverage was exhausted and claimed other coverage clauses should have been applied. She claimed she never agreed to an extension of the living expenses provision in 2018 because there was no mutual assent.

In January 2019, plaintiff met with a contractor who said it would complete the work for $200,000. Plaintiff claimed the policy did not have firm limits on the amount of coverage and defendant could transfer coverage limits

10

between the provisions. Therefore, it did not matter that the additions and alterations coverage limit was $229,700. Although plaintiff agreed the policy contained monetary limits, she contended, "the reasonable expectation [of an insured] would be that . . . [defendant would] cover [her] damaged [property] fully for the true value."

Plaintiff testified the rebuilding-to-code provision meant all reconstruction had to be to code, and since the condominium was not rebuilt, defendant had not satisfied the policy requirements. The amount of time required for payment under the additional living expenses coverage was however long it took to rebuild her condominium. Plaintiff had no personal knowledge of the work performed by Petra.

As noted, two claims adjusters were also deposed. The first adjuster had thirty years of experience and took over the claim in 2019 from another adjuster who had retired, to help resolve it. He believed the twenty-one months allocated for reconstruction were beyond what was necessary. Plaintiff's policy contained limits based on the terms of the coverages, and even those that did not have a monetary limit were limited based on the period of restoration. He testified defendant worked hard to resolve the claim, but plaintiff's contractors "hindered the possibility of completing the project."

A-1843-24

The second adjuster testified plaintiff's property was not habitable when he visited it. He explained plaintiff's policy did not contain an aggregate monetary limit and once the limit on a specific policy provision was reached there could be no further payouts. The policy did not define what a reasonable amount of time to complete the rebuild was, but in practice it would be an amount of time decided on between the contractor and defendant. Plaintiff's additional living expenses coverage was terminated based on defendant's estimation of the reasonable amount of time it should have taken to complete the rebuild. The adjuster testified defendant acted reasonably as evidenced by its efforts to work with contractors and the extensions it granted plaintiff after various delays occurred.

The architect was deposed in October 2021. He explained the decision to hire Petra was his and plaintiff's. He recounted his meeting with defendant and Petra in 2019 to discuss the "progress or lack of progress" on the project. During this time, he was "brought on as a consultant architect . . . to advise and determine what[ wa]s going on." He did not independently determine what the work would cost and based his opinion on plaintiff's contract with Petra and the amount of work left to be paid for. The architect conceded he did not review the contract in 2018 or 2019.

12

The architect explained there was a change in the building code regarding electrical issues since the condominium was originally built. He did not know if any electrical work had been performed on the condominium when he inspected it in 2021. There were also changes made to the lighting and HVAC during the rebuilding process, but he was unsure whether they related to the broken pipe. He opined Petra's work did not comply with the code because the repair work had not yet been completed. The architect conceded he was not a professional estimator of construction projects.

Defendant retained an expert who prepared a report on what a reasonable amount of time for additional living expenses would be as of October 5, 2021. He opined a twenty-one-month timeframe was sufficient to remediate the mold, complete the rebuild, and pay plaintiff's additional expenses. The expert stated the asbestos would have easily been identified by an experienced contractor, and Petra's two-and-one-half-year delay in noticing the asbestos was "inexplicable." Defendant's extension of coverage for forty-three months "vastly exceed[ed] any reasonable timeframe to repair th[e] single bedroom condo[minium]."

Discovery concluded in January 2022. Each party again moved for summary judgment.

Defendant argued the policy language regarding the coverage limits was clear and it had fully compensated plaintiff. The coverage under the additional living expenses provision was not indefinite and was intended to last for a reasonable amount of time. Also, plaintiff failed to retain an expert to opine on this issue while defendant had retained an expert who opined twenty-one months of coverage was reasonable. Defendant noted it paid forty-three months of additional living expenses.

Plaintiff asserted the policy was clear defendant had to restore her condominium to a habitable state, and its failure to do so was a breach of contract and fiduciary duty. The building codes had changed since the loss, and defendant was required to pay to rebuild pursuant to the new standards. She contended defendant was responsible for the increased costs, which were not limited by the rebuilding-to-code provision, because insurance policies are contracts of adhesion. Plaintiff argued the additional living expenses coverage was not limited in amount, but rather, whether the period of payment was reasonable.

The trial court issued a written decision on March 17, 2022. It found the rebuilding-to-code provision was "ambiguous and that a reasonable factfinder could conclude that this provision is not limited, as [defendant] suggests, to only

14

covering the 'increased' costs associated with bringing . . . the [u]nit [up] to code." It was unclear how much work was performed to date but clear that plaintiff's condominium needed more work to be code compliant. "[R]easonable minds could differ regarding whether the [p]olicy's provision for costs associated with rebuilding the [u]nit to code allows for more coverage than what [p]laintiff has already been provided."

The court also declined to grant summary judgment regarding the additional living expenses provision because there were "genuine issues of material fact . . . regarding what constitutes a 'reasonable amount of time' taking into account the totality of the circumstances surrounding the efforts to rebuild the [u]nit." It found "[t]he true cause of the delays in the [u]nit's repair is very much in dispute . . . along with whether [p]laintiff is entitled to additional coverage under the [p]olicy's terms."

In April 2022, each party moved for reconsideration. Plaintiff contended the rebuilding-to-code provision was a part of the extra coverage clauses of the policy, and defendant's own construction standards acknowledged an obligation to rebuild up to the latest code standards. This meant defendant's obligation to pay until the rebuild was up to code was not limited.

Defendant argued each policy provision, except the contents clause, was an extra coverage. The rebuilding-to-code coverage only applied to the costs of a damaged item that did not comply with existing code. Expert testimony was required to conclude whether an item had been adequately paid for to rebuild to code. Petra's rebuild work did not involve code issues. The issue of additional living expenses also required expert testimony, which plaintiff lacked. Defendant argued summary judgment in its favor was appropriate because plaintiff could not meet the burden of proof at trial.

The trial court made oral findings. It denied plaintiff's motion for reconsideration, noting although it initial finding of ambiguity in the rebuilding-to-code provision was not "dispositive with regard to a jury's determination." The jury would consider the parties' evidence regarding how they interpreted the policy and draw its own conclusions as to whether defendant complied with the policy terms. The court denied defendant summary judgment because it continued to find the rebuilding-to-code provision ambiguous and the matter was "best left to . . . a jury to hear and . . . consider." This was also the case for the additional living expenses provision because there was a dispute whether it was defendant's fault or Petra's, "who refuses to proceed with the finalization of completing the work on [plaintiff]'s condo[minium]."

16

In May 2023, defendant filed a motion in limine to bar the additional living expenses claim because plaintiff failed to retain an expert to prove the claim. On May 26, 2023, the trial court granted the motion and dismissed plaintiff's claim for additional living expense coverage with prejudice. The court's order noted it did not consider plaintiff's opposition because her certification exceeded the page limits under Rule 1:6-5. Plaintiff sought interlocutory review, and we granted her motion, directing the court to consider plaintiff's opposition.

On November 9, 2023, the trial court denied the motion in limine. It found although plaintiff had not retained an expert to address "the objective coverage issue and what the reasonable period of time" was to rebuild her condominium, her strategy was "to challenge defendant's expert and present and argue other factors that might have contributed to the delay." Although the strategy had its risks because plaintiff was not an expert and could not opine on the coverage issue, "N.J.R.E. 702 does not compel the use of an expert, it permits the use of an expert." The court declined to rule prospectively on what plaintiff or a contractor might testify to at trial, leaving the matter to the judge trying the case.

Following a five-day trial in January 2025, a jury found plaintiff did not prove defendant breached the insurance contract by not providing additional

coverage under the rebuilding-to-code provision of the policy. On February 7, 2025, the trial court entered an order for judgment of no cause of action based on the verdict and dismissed plaintiff's complaint with prejudice.

I.

On appeal, plaintiff argues, as a matter of law, the ambiguity in the policy required the trial court to interpret the policy as extending coverage to her under the rebuilding-to-code provision and grant her summary judgment on this issue rather than submit it to the jury. This is because insurance contracts are contracts of adhesion and should be construed in favor of the non-drafting party. She contends where an insurance contract is ambiguous, the insured's reasonable expectations should prevail, and all ambiguities should be resolved against the insurer.

Plaintiff alleges the rebuilding-to-code provision had no monetary limit and provided coverage to the extent necessary to make the repairs conform to laws or ordinances. The additional living expenses provision also contained no pre-determined monetary limitation because it promised defendant would pay for "extra living expenses such as secondary housing 'for the reasonable amount of time required to restore your condominium unit to a habitable condition.'" Plaintiff asserts we must reverse because the trial court found a genuine issue of

18

fact regarding the "reasonable amount of time," but the jury did not reach the issue because it determined the rebuilding-to-code provision afforded plaintiff no coverage.

On the cross-appeal, defendant argues we should reverse the March 17, 2022 order because the trial court erred when it found the rebuilding-to-code provision was ambiguous. The court also erred when it concluded plaintiff did not need an expert to prove her claim for additional living expenses beyond the forty-three months defendant already paid on plaintiff's behalf.

II.

On appeal, we review a contract, such as an insurance policy, de novo. Pickett ex rel. Est. of Pickett v. Moore's Lounge, 464 N.J. Super. 549, 554-55 (App. Div. 2020). "[A] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). A trial court's grant or denial of a motion for summary judgment is subject to a de novo review as well, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022).

A-1843-24

Rule 4:46-2(c) states a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540).

Insurance policies "will be enforced as written when [the] terms are clear in order that the expectations of the parties will be fulfilled." Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010). A policy's terms and meanings are

reviewed "according to its plain and ordinary meaning."  Ibid. (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992)).  If an ambiguity exists, a policy is "construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations."  Ibid.  This is because policies are drafted by insurers.  See Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 41 (1960).

Ambiguity does not arise merely "because two conflicting interpretations have been offered" but because "the 'phrasing of the policy is so confusing . . . the average policyholder cannot make out the boundaries of coverage.'" Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 428-29 (App. Div. 2004) (quoting Lee v. Gen. Accident Ins. Co., 337 N.J. Super. 509, 513 (App. Div. 2001)).  It does not matter if a closer reading of the policy would have yielded a different result or alerted an insured about a lack of coverage.  Flomerfelt, 202 N.J. at 441.  In analyzing a policy, a court cannot "write for the insured a better policy of insurance than the one purchased."  Ibid. (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529 (1989)).

While consumer contracts, like insurance policies, must "be written in a simple, clear, understandable[,] and easily readable way," they still must be read "as a whole."  N.J.S.A. 56:12-2.  Reasonable expectations must be considered

objectively. <u>Voorhees</u>, 128 N.J. at 175. "[T]he judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose." <u>Owens v. Press Publ'g Co.</u>, 20 N.J. 537, 543 (1956). When interpreting insurance policies, courts consider "the contractual terms, the surrounding circumstances, and the purpose of the contract." <u>Marchak v. Claridge Commons, Inc.</u>, 134 N.J. 275, 282 (1993).

Pursuant to these principles, we discern no error in the trial court's conclusion the rebuilding-to-code provision was ambiguous. Under the 2014-2015 policy, a covered loss to plaintiff's property is covered by the additions and alterations provision. The clause covers "additions, alterations, fixtures, improvements, installations or items of real property." The rebuilding-to-code provision covers "the necessary cost of conforming to any law or ordinance that requires or regulates" repairs or the demolition of parts of a condominium. Nothing in the rebuilding-to-code provision denoted its limit or how the provision related to or should be applied vis-à-vis other provisions of the policy, including the additions and alterations coverage limit. For these reasons, the court properly denied defendant summary judgment.

22

However, the ambiguity of the provision was not the end of the inquiry because a court must examine the reasonable, objective expectations of the policy, Voorhees, 128 N.J. at 175, and apply "a rational meaning in keeping with the expressed general purpose" of the policy, Owens, 20 N.J. at 543. In this regard, summary judgment was properly denied to plaintiff because the policy language does not conclusively support the notion she had unlimited coverage. The policy's main provisions—such as the contents and the additions and alterations—had definitive limits, and defendant made payments in accordance with those limits. On the other hand, defendant also paid for other expenses, which did not have a monetary cap in the policy for several years. Therefore, it fell to the jury to decide whether defendant breached the policy by ceasing payment under the rebuilding-to-code provision pursuant to the facts presented. Put another way, the jury was not tasked with interpreting what the insurance policy meant, but instead whether defendant was required to continue making payments.

Although we lack the trial transcripts, including the transcript of the charge conference, the appellate record contains the jury questionnaire, which shows the jury was asked to decide whether plaintiff proved defendant breached the insurance policy by not providing additional coverage under the rebuilding-

23

to-code provision. "Additional coverage" clearly meant the dollar amount paid out and requested to be paid out. If the jury answered "no," it was instructed to return its verdict and not reach the secondary question of whether defendant breached the policy by not providing additional coverage under the additional living expenses provision. At oral argument, plaintiff conceded if there was no breach of contract under the rebuilding-to-code provision, no further funds were owed. Clearly, the jury was answering a monetary question, not a legal one.

The jury returned a unanimous verdict in the negative on the first question, and so it did not reach the additional living expenses claim. For these reasons, we affirm on the appeal and need not reach defendant's cross-appeal argument the trial court erred when it denied the motion in limine to dismiss the additional living expenses claim for plaintiff's failure to produce an expert to prove this claim.

Regardless, defendant's brief on cross-appeal notes its expert testified about the reasonableness of the additional living expenses and was subject to cross-examination. Plaintiff does not dispute this assertion. Therefore, as the trial court correctly predicted when it decided the in limine motion, plaintiff did not need an expert of her own and could gamble on whether she could prove the additional living expenses claim by cross-examining defendant's expert.

A-1843-24

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1843-24