

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-12-1995

# Chemical Leaman v Aetna

Precedential or Non-Precedential:

Docket 93-5777

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Chemical Leaman v Aetna" (1995). *1995 Decisions.* Paper 264.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/264

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-5777 and 93-5794


CHEMICAL LEAMAN TANK LINES, INC.

v.

THE AETNA CASUALTY AND SURETY COMPANY;
and CERTAIN UNDERWRITERS AT LLOYDS, LONDON,
subscribing to Insurance Policies Numbers Numbers
WAR 6771, WAR 6772/A, C62P 10-117, L62P 10-117,
64P 3-121, L64P 3-121A, L64P 3-121B, C64P 3-121B,
C65P 5-119, C65P 5-119A, L65P 5-119A, L66P 5-119A,
C67P 4-158, L67P 4-158, C68P 2-116, L68P 2-116,
C68P 2-116A, C68P 2-116B, L68P 2-116A, L68P 2-116B,
C71-03-03-13, L71-03-03-13, C71-03-03-13A,
C71-03-03-13B, L71-03-03-13A, L71-03-03-13B,
C74-03-18-02, 77-01-19-23, 77-01-19-23A, C77-01-19-23B,
79-04-19-10, C80-02-19-09, C80-02-19-09B, L80-02-09A,
L80-02-19-09A, L80-02-19-09B, C83-02-19-09,
L83-02-19-09A, L83-02-19-09B, L83-02-19-09C


ROBIN ANTHONY GILDART JACKSON, an Underwriter at Lloyds,
London, individually and in his capacity as representative
Underwriter at Lloyds, London for certain subscribing
Underwriters at Lloyds, London who subscribed to certain
liability insurance policies issued to plaintiff Chemical
Leaman Tank Lines, Inc.; ACCIDENT AND CASUALTY COMPANY OF
WINTERTHUR; ALBA GENERAL INSURANCE COMPANY LTD.; ALLIANZ
CORNHILL INTERNATIONAL INSURANCE PLC, FORMERLY KNOWN AS
ALLIANZ INTERNATIONAL INSURANCE COMPANY LTD.; ANGLO-FRENCH
INSURANCE COMPANY LTD.; ARGONAUT NORTHWEST INSURANCE COMPANY;
ASSICURAZIONI GENERALI SPA; BALOISE FIRE INSURANCE COMPANY;
BELLEFONTE INSURANCE COMPANY LTD.; BRITISH NATIONAL LIFE
INSURANCE SOCIETY LTD.; CNA INTERNATIONAL REINSURANCE CO.
LTD., FORMERLY KNOWN AS CNA REINSURANCE OF LONDON LTD.;
DELTA LLOYD NON-LIFE INSURANCE COMPANY; DOMINION INSURANCE
COMPANY LTD.; DRAKE INSURANCE COMPANY LTD.; EDINBURGH
INSURANCE COMPANY; EXCESS INSURANCE COMPANY LTD.; FIDELIDADE
INSURANCE COMPANY; FOLKSAM INTERNATIONAL INSURANCE COMPANY
(U.K.) LTD.; HELVETIA ACCIDENT SWISS INSURANCE COMPANY;
INDEMNITY MARINE ASSURANCE COMPANY, LTD.; LEXINGTON INSURANCE

1

COMPANY LTD.; LONDON & OVERSEAS INSURANCE COMPANY, LTD.; LONDON & EDINBURGH INSURANCE COMPANY, LTD.; LONDON & SCOTTISH ASSURANCE CORPORATION, LTD.; GAN MINSTER INSURANCE COMPANY, FORMERLY KNOWN AS MINSTER INSURANCE COMPANY LTD.; NATIONAL CASUALTY COMPANY; NATIONAL CASUALTY INSURANCE OF AMERICA, LTD.; NEW LONDON REINSURANCE COMPANY, LTD.; NORTH ATLANTIC INSURANCE COMPANY LTD., FORMERLY KNOWN AS BRITISH NATIONAL INSURANCE CO. LTD.; ORION INSURANCE COMPANY LTD.; PINE TOP INSURANCE COMPANY LTD.; RIVER THAMES INSURANCE COMPANY LTD.; SCOTTISH LION INSURANCE COMPANY; SOVEREIGN MARINE AND GENERAL INSURANCE COMPANY, LTD.; SPHERE INSURANCE COMPANY LTD.; ST. KATHERINE INSURANCE COMPANY LTD.; STRONGHOLD INSURANCE COMPANY LTS.; SWISS UNION GENERAL INSURANCE COMPANY LTD.; TAISHO MARINE & FIRE INSURANCE COMPANY (EUROPE) LTD., FORMERLY KNOWN AS TAISHO MARINE & FIRE INSURANCE COMPANY (U.K.) LTD.; TOKIO MARINE & FIRE INSURANCE COMPANY (U.K.) LTD.; TUREGUM INSURANCE COMPANY LTD.; UNIONAMERICA INSURANCE COMPANY; UNITED STANDARD INSURANCE COMPANY LTD.; WINTERTHUR SWISS INSURANCE COMPANY; WORLD AUXILIARY INSURANCE CORPORATION LTD.; YASUDA INSURANCE COMPANY (U.K.) LTD.
(hereinafter collectively referred to as "Jackson & Companies"),

Appellants in No. 93-5777

Aetna Casualty and Surety Company ("Aetna"),

Appellant in No. 93-5794

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 89-1543)

Argued: September 26, 1994
Before: SCIRICA, NYGAARD and McKEE, <u>Circuit</u> <u>Judges</u>.

(Filed October 12, 1995)

BRIAN J. COYLE, ESQ. (Argued)
PETER E. MUELLER, ESQ.
HARWOOD LLOYD, ESQ.
130 Main Street
Hackensack, NJ 07601

EDWARD M. DUNHAM, JR., ESQ.
DANIEL W. CANTU-HERTZLER, ESQ.

2

Miller Dunham Doering & Munson
1515 Market Street, 13th Floor
Philadelphia, PA 19102-1913

WILLIAM H. JEFFRESS, JR., ESQ.
Miller, Cassidy, Larroca & Lewin
2555 M Street, N.W.
Washington, D.C. 20037

Counsel for Appellant
Aetna Casualty & Surety Company

JOHN G. MCANDREWS, ESQ.
HENRY LEE, ESQ. (Argued)
HANNAH M. O'DRISCOLL, ESQ.
GARY P. SCHILZ, ESQ.
Mendes & Mount
750 Seventh Avenue
New York, NY 10019-6829

WILLIAM J. HANLEY, ESQ.
Ronca, McDonald & Hanley
5 South Regent Street
Livingston, NJ 07039

Counsel for Appellant
Robin Anthony Jackson, An
   Underwriter at Lloyds, London,
and Certain London Market
Insurance Companies
("London Market Insurers")

KEVIN B. CLARK, ESQ. (Argued)
JOHN P. DEAN, ESQ.
CARLISLE E. PERKINS, ESQ.
CONRAD J. SMUCKER, ESQ.
Willkie Farr & Gallagher
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20036-3384

Counsel for Plaintiff-Appellee
Chemical Leaman Tank Lines, Inc.

THOMAS W. BRUNNER
JOHN E. BARRY
DENNIS A. TOSH
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington, D.C. 20006

3

Counsel for Amicus Curiae
Insurance Environmental
Litigation Association

DEBORAH T. PORITZ
Attorney General of New Jersey
MARY C. JACOBSON
Assistant Attorney General
KAREN L. JORDAN
Deputy Attorney General
R.J. Hughes Justice Complex
CN 093
Trenton, NJ 08625

Counsel for Amicus Curiae
State of New Jersey, Department
of Environmental Protection and
Energy

OPINION OF THE COURT

McKEE, Circuit Judge.

Chemical Leaman Tank Lines, Inc. brought this declaratory judgment action in an effort to determine if various policies of insurance issued by defendant insurance companies covered the cost of environmental cleanup of a waste disposal site it maintained in Bridgeport, New Jersey. Although numerous issues are raised on appeal, the primary issue is the appropriate test to determine if Chemical Leaman "expected or intended" environmental damage. We hold that, under New Jersey law, the appropriate inquiry is the insured's objective intent and that the district court erred when it instructed the jury that it must determine if Chemical Leaman subjectively "expected or intended"

4

to damage the environment.  Since we determine as a matter of law that Chemical Leaman did expect or intend environmental damage as of November, 1968, we remand for a new trial to determine Chemical Leaman's objective intent during the years remaining in question.

**I. Background**

**A. <u>The Bridgeport Site</u>**

Chemical Leaman is a tank truck company specializing in the transportation of hazardous chemicals including carcinogens.  The Bridgeport terminal at issue here was one of many terminals that Chemical Leaman maintained across the country.  These terminals included facilities where Chemical Leaman would routinely wash the trailers that transported the hazardous chemicals after those chemicals had been delivered.  The rinse water contaminated with residue from the inside of the trailers was disposed of in a wastewater treatment system that is at the heart of this law suit.

The Bridgeport wastewater treatment system consisted of a series of unlined ponds dug into the soil to catch and purportedly purify the contaminated washwater.  Apparently, the designers of this system believed that the sandy bottom of the unlined ponds would purify the contaminated rinsewater by acting as a kind of natural filter that would strain the impurities from the contaminated water as it percolated into the soil.  The facility operated in this manner from 1960 to 1975.  It was designed and built by Harry Elston, Chemical Leaman's Manager of Real Estate and Engineering, in consultation with Edwin Wagner, a

5

professional sanitary engineer with experience in the design of waste treatment facilities. Elston made virtually all of Chemical Leaman's decisions regarding waste management and disposal.

From 1960-62, the wastewater treatment system consisted of a series of three unlined settling and percolation ponds, connected by "tee pipes." Elston testified that the depth of the ponds was limited to five feet to allow sunlight to enhance the growth of aerobic microbes that fed on the trace amounts of chemicals in the rinsewater. This natural process was enhanced by anaerobic microbes acting in the ponds and lagoons to biodegrade the chemical particulates in the rinsewater. Gravity separated heavier materials from lighter ones in the first pond, and the floating contaminants were then periodically skimmed from the top of the ponds, and the settled materials were periodically dredged from the bottom of the ponds. The natural processes of aerobic and anaerobic microbial biodegradation would break down the trace chemical constituents which remained in the rinsewater.

A "tee pipe" connected the first and second ponds so as to prevent the precipitated and floating materials from passing into the second pond. Thus, only "cleaner" water could reach the second pond. When this rinsewater reached the second pond, the retention, phased gravity separation, percolation and microbial biodegradation process was repeated. Only the rinsewater in the middle depth of that pond was allowed to flow into the third pond. These processes continued in the third pond, which received the "cleanest" water as a result of the processes

occurring in the first two ponds.  Elston testified at trial that the Bridgeport site was specially selected for its suitability for this kind of percolation system.

In 1962, Chemical Leaman augmented this system by adding two larger aeration lagoons and a final settling lagoon with a limestone bed.  Each of these lagoons was designed to replicate and enhance the treatment afforded by the original three ponds.  In addition, the fourth and fifth lagoons were equipped with spray aeration devices to increase the oxygen level in the lagoons and, thereby, increase aerobic microbial biodegradation and evaporation.

From the very beginning of this system, the final impoundment pond contained an overflow pipe at the top end of the berms which fed into an adjacent swamp.  The pipe was apparently intended as a safety valve to prevent a rupture in the berms and a resulting massive loss of rinsewater in the event of a heavy rain.  Between 1960 and 1975, there were repeated discharges of treated rinsewater through the overflow pipe to the adjacent swamp.  Elston described this discharge as a "trickle," and another witness testified that the amount coming out of the overflow pipe was usually about a fraction of an inch.  Nevertheless, a 1970 New Jersey Department of Health sample of the swamp water that the rinsewater "trickled" into revealed that this trickle was "highly pollutional."  Moreover, by 1974 the path of the "trickle" from the last impoundment could "be easily seen by looking for a 75 foot wide lane of dead trees" in the swamp.

## B. **The Insurance Policies**

Chemical Leaman purchased primary comprehensive general liability insurance ("CGL") from the Aetna Casualty & Surety Company ("Aetna") covering successive years, from April 1, 1959 through April 1, 1985.[0] During this same period of time, the London Market Insurers ("LMI") sold Chemical Leaman excess CGL coverage.[0] Each of the primary and excess policies provided coverage (and a duty to defend) only for fortuitous damage, i.e. damage that was "neither expected nor intended from the standpoint of the insured." Some of these policies insured against an "accident," and others insured against an "occurrence" but it is clear that each of these policies covered only fortuitous damage, i.e. damage that the insured neither expected nor intended.

The LMI policies typically stated:
> [s]ubject to the limitations, terms and conditions [of the policy] to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability . . . imposed upon the Assured by law, . . . for damages . . . on account of: .

---

[0] During trial, Chemical Leaman dismissed its claims against the 1981-1985 policies, and the district court granted summary judgment in favor of Aetna on the 1959-1960 policy because Chemical Leaman had not presented evidence of damage that could have triggered this policy. We need not discuss the specific provisions of the Aetna policies since they have withdrawn as a party to this appeal. See infra at ___.

[0] At oral argument before the district court, Chemical Leaman dismissed any claims it had against LMI on the policy running from April 1, 1985 to April 1, 1986. Apparently, Chemical Leaman dismissed its claims against the 1981-1985 policies as well. The LMI do not state what happened in their brief, as they say they provided excess coverage from 1960-1981 and cite to a stipulation in the appendix, but the stipulation states they provided coverage from 1958-1986.

. . (ii) Property Damage . . . caused by or arising out of each occurrence . . . .

These policies defined "occurrence" as "[a]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . property damage . . . during the policy period."[0]

The policies required that the insured provide written notice in the event of an occurrence or accident "as soon as practicable." The policies also provided that the insured shall cooperate with the insurer in the defense of a potentially coverable claim, suit or proceeding instituted against the insured or insurer.

Each LMI policy from April 1, 1971 to April 1, 1985, contained a pollution exclusion clause. Because we hold that those policies do not insure against the damage that occurred after November, 1968, we do not reach any of the issues raised under the pollution exclusion clauses.

## C. Contamination of the Bridgeport Site

At the time the Bridgeport facility was built, New Jersey prohibited the construction of industrial waste treatment systems

---

[0] Some of the LMI's earlier policies insured against an "accident," which was circularly defined as "an accident or series of accidents arising out of one event or occurrence." On summary judgment, the district court reasoned that New Jersey law defines the term "accident" in the accident-based policies in substantially the same manner as the definition of an "occurrence" in the occurrence-based policies -- an event neither expected nor intended by the insured. See Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co., 817 F. Supp. 1136, 1148 (D.N.J. 1993). Thus, the court held that Chemical Leaman would bear the same standard of proof on the accident policies as it would on the occurrence-based policies. This finding is not challenged on appeal.

without the approval of the New Jersey Department of Health ("NJDOH"), and this prohibition was especially applicable to treatment facilities discharging effluent into surface and underground waters. See N.J. Rev. Stat. § 58:10-5 (1937) (prohibiting pollution of freshwater without Department of Health permit) (repealed 1977); N.J. Rev. Stat. §§ 58:11-10, 11-12 (1937) (requiring Department of Health approval for any change in sewage or industrial waste treatment system; owner of such system must periodically furnish information required by the department) (repealed 1977); N.J. Rev. Stat. §§ 58:12-1, 12-2, 12-3 (1937) (prohibiting operation of a plant for the treatment of polluting substances from which the effluent is to flow into any waters of the states unless approved by Department of Health; "waters of the state" include . . . all springs, streams and bodies of surface or groundwater) (repealed 1977).

Chemical Leaman never obtained the required permits or approvals from the State of New Jersey to construct or operate the waste water disposal facility at Bridgeport. However, despite Chemical Leaman's failure to get official approval, the State of New Jersey learned the Bridgeport site was in operation. In March 1961, the New Jersey Division of Fish, Game & Wildlife ("FGW") received a complaint of a number of dead fish in a pond that was fed by swamp water flowing from the direction of the Bridgeport facility. The complaint suggested that Chemical Leaman's facility may be responsible. On September 12, 1961, Inspector Walter Robinson of the Pollution Unit of the FGW inspected the Bridgeport facility and noticed a discharge into

10

the swamp from the overflow pipe in the last pond.  Robinson had observed this discharge on about half of his visits to the Bridgeport site, and had concluded in a report dated September 12, 1961 that "these conditions are not satisfactory." Thereafter, Chemical Leaman was asked to stop the discharge.

Chemical Leaman responded by agreeing to attempt to purchase property to use as a disposal area and to retain a consultant to correct this situation.  In return, FGW informed Chemical Leaman that FGW expected "all work to be completed and pollution stopped by September 1, 1962."  Chemical Leaman's response was the construction of the second set of unlined earthen aeration lagoons and the final settling lagoon discussed earlier.

Inspector Robinson revisited the Bridgeport site on July 31, 1962, to check on the status of the new treatment system.  His progress report noted that while a new spray disposal system had been installed in an adjacent field, the area still "has to be diked and a new separator has to be installed in the old settling ponds."  Although his report noted that the work should be completed in six weeks, there is no indication that this work was ever completed.  Robinson's "Progress Report" did note that effluent was seeping into the ground as intended and not into the swamp and that this was "a good indication" that the new treatment system was working properly.  However, at trial, Robinson testified that he may have thought the pits were lined, since "that's the way things were done."  Moreover, Robinson's responsibility was limited to preventing discharges to adjacent waters that could affect the fish or wildlife in the State of New

11

Jersey. Thus, seepage into the ground, whether or not potentially harmful to the groundwater, or any aspect of the environment other than fish and wildlife, was not his concern.[0]

Robinson's initial optimism proved unfounded when, in November 1968, water pollution inspectors from the New Jersey Department of Health ("NJDOH") again observed a discharge from the overflow pipe in the last lagoon. The NJDOH water pollution inspectors concluded that "the waste emanating from the lagoon is highly pollutional and [that] immediate measures [sic] be taken to eliminate this discharge or to sufficiently treat the waste prior to discharge." The inspectors also concluded that the Bridgeport site was operating in violation of State statutes since it was discharging an effluent without appropriate Departmental approval. As a result, in February 1969 the NJDOH ordered Chemical Leaman to submit plans "concerning the methods and operations of a system designed to properly treat the effluent of their tank truck washing facility." In May 1969, Chemical Leaman submitted a plan for a new rinse water treatment system designed by its own engineering department. However, State regulators rejected this plan as they found the amount of remaining chemical residue in the treated rinsewater that would be discharged to a nearby stream to be unacceptable.

---

[0]    Ironically, while assessing Chemical Leaman's proposed solution for its pollution problem, Robinson observed one trailer being drained directly onto the parking lot. While such conduct was apparently a violation of company policy and would subject the individual to disciplinary action, this was not the only occasion on which he observed this prohibited conduct.

In February 1970, the NJDOH sampled the waste water in the lagoons and found the discharge to be "objectionable." Thereafter, State officials again met with Chemical Leaman in an unsuccessful attempt to resolve the polluting discharges at the Bridgeport site. Chemical Leaman eventually entered into a consent judgment with the New Jersey Department of Environmental Protection ("NJDEP") on January 28, 1974, which mandated construction of an approved facility by April 1974. Subsequently, in 1975, Chemical Leaman fully alleviated its waste water disposal problems when Du Pont agreed to take and treat the waste water.

From November 1968, when water pollution inspectors from the NJDOH observed the discharge from the overflow pipe, until the summer of 1975, when the contract with Du Pont was entered into, some 40 to 50 million gallons of contaminated waste water was processed using the same treatment system as modified in 1962. Throughout the time the Bridgeport site was in operation Chemical Leaman discharged approximately 100 million gallons of contaminated waste water into the unlined ponds and lagoons, the bottoms of which were only two and a half feet above the groundwater.

In late 1980, a routine NJDEP survey revealed the existence of contaminated groundwater at and around the Bridgeport site. A subsequent investigation disclosed that groundwater beneath the terminal was contaminated and that Chemical Leaman's unlined ponds and lagoons were the primary source of contamination. Thereafter, Chemical Leaman entered into an Administrative

13

Consent Order with the NJDEP to study the scope of the groundwater contamination at Bridgeport, and in 1984, the United States Environmental Protection Agency ("EPA") placed the Bridgeport Site on the Superfund National Priorities List. 42 U.S.C. §§ 9605, 9607.[0]  As an owner and operator of the site, Chemical Leaman is strictly liable under CERCLA for the cost of the environmental cleanup.  Id.

In July 1985 Chemical Leaman entered into a consent decree with the EPA based upon a finding that four neighboring wells were contaminated, and that three more were threatened.  In that decree Chemical Leaman acknowledged liability and agreed to undertake a Remedial Investigation and Feasibility Study ("RI/FS") of environmental contamination at the site.  It is this CERCLA liability for which Chemical Leaman seeks coverage under the policies purchased from the insurers.

## II. Procedural History

Chemical Leaman filed a declaratory judgment action in district court to determine its right to insurance coverage after Aetna and LMI refused to indemnify it for any of the costs of the environmental cleanup at the Bridgeport facility.

On March 31, 1992, after extensive discovery, the district court filed an opinion granting partial summary judgment in favor of Chemical Leaman.  See Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co., 788 F. Supp. 846 (D.N.J. 1992).  The court held that the "owned property exclusion" contained in the

---

[0]    42 U.S.C. §9607(a)(1).

14

policies does not bar coverage for the costs of remedial measures designed to benefit the ground or surface waters in the vicinity of the Bridgeport site.[0]

Subsequently, the district court ruled that genuine issues of material fact remained as to whether Chemical Leaman expected or intended to cause soil and groundwater damage.  See Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co., 817 F. Supp. 1136 (D.N.J. 1993).  The district court rejected the insurers' argument that Chemical Leaman's objective intent to injure the soil and groundwater controlled whether there had been an "occurrence" under the insurance policies.  The court also relied on Voorhees v. Preferred Mut. Ins. Co., 607 A.2d 1255 (N.J. 1992), to conclude that Chemical Leaman's actions at the Bridgeport site were not so "reprehensible" as to require a presumption that Chemical Leaman expected or intended to cause the groundwater and soil damage.  Instead, the court concluded that Chemical Leaman had the burden of proving that it did not subjectively intend to cause soil and groundwater damage, and that it was not substantially certain that it was causing such damage.

In ruling upon motions for partial summary judgment, the court found that soil and groundwater damage occurred sometime during 1960, thus triggering the 1960-61 policies.  The court also ruled as a matter of law that soil and groundwater damage occurred in the policy year April 1, 1960 to April 1, 1961, but

---

[0]    The other issues that the district court decided as a matter of law are not raised on this appeal.

15

that the continuous trigger doctrine determined whether property damage also occurred under the remaining policies.[0] Since there were disputed issues of fact the court held that the jury would have to determine whether injuries occurred during each policy period, whether Chemical Leaman subjectively expected or intended the injuries, and whether the injuries caused by the use of the Bridgeport rinsewater treatment system were of a continuous, indivisible nature. Finally, the court held that Chemical Leaman's failure to promptly notify its insurers of its liability under CERCLA did not bar recovery under the notice provisions of the various insurance policies because the insurers had not been prejudiced by the delay.

Prior to trial, Chemical Leaman filed a motion *in limine* to bar evidence of environmental problems it had encountered at sites other than Bridgeport. The court granted that motion holding that the probative value of the other-site evidence was substantially outweighed by the danger of unfair prejudice, jury confusion, and undue waste of time. That ruling is also challenged on this appeal.

### III. The Jury's Findings

After a three week trial, the jury found that Chemical Leaman was entitled to coverage under the Aetna and LMI policies as follows: the policies in effect from April 1, 1960 to April 1, 1971 – for costs associated with the remediation of the soil; the

---

[0] The time of an "occurrence" is the time when the complaining party is damaged. See Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co., 483 A.2d 402, 409 (N.J. 1984).

16

policies in effect from April 1, 1961 to April 1, 1971 – for the remediation of the wetlands; and the policies in effect from April 1, 1960 to April 1, 1981 – for groundwater remediation. The jury also found that Chemical Leaman was entitled to defense costs that were incurred after April 18, 1988. The insurers challenge both the court's and jury's findings on appeal. The court instructed the jury that it had to find for Chemical Leaman unless it concluded that Chemical Leaman subjectively expected or intended to cause the pollution at the Bridgeport site. This charge is at the center of this appeal as the insurers argue that the appropriate inquiry is Chemical Leaman's objective expectation and intent. The insurers argue that, viewed objectively, the evidence established that the damage at Bridgeport was expected and/or intended by Chemical Leaman, and that there was therefore no accident or occurrence under the various policies.

Subsequent to oral argument but prior to our disposition of this appeal, Chemical Leaman and Aetna settled all of Chemical Leaman's environmental claims against Aetna, including the claims involved in this appeal. In accordance with the settlement agreement filed with this court, Aetna withdrew as a party to this appeal. LMI, however, was not a party to that settlement agreement. Therefore, we must still address the issues raised as they pertain to LMI.[0]

---

[0] Practically speaking, Aetna's withdrawal from this appeal has no effect on the issues which we must address since LMI and Aetna joined in each other's arguments.

Although LMI raises numerous issues, our inquiry focuses upon whether there has been an "accident" or "occurrence" as defined by the CGL policies.[0] Following the court's rulings on the post-trial motions, the New Jersey Supreme Court decided Morton Int'l, Inc. v. General Accident Ins. Co. of Am., 629 A.2d 831 (N.J. 1993).[0] We are guided by Morton and Voorhees, supra. Our review of the district court's interpretation and prediction of New Jersey law is plenary.[0] See Wiley v. State Farm Fire & Casualty Co., 995 F.2d 457, 459 (3d Cir. 1993).

The parties agree that New Jersey law governs this dispute. It is also clear that we must apply state law as it exists today, even if the law may have changed since the judgment of the district court. See Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 543 (1941); Air Products & Chemicals, Inc. v. Hartford Accident & Indem. Co., 25 F.3d 177, 181 (3d Cir. 1994); National Sur. Corp. v. Midland Bank, 551 F.2d 21, 28 (3d Cir. 1977). Thus, "intervening and conflicting state court decisions will

---

[0] Aetna briefed the "occurrence" issue and LMI joined in and incorporated the arguments advanced by Aetna. See LMI brief at 50; LMI Reply brief at 1-2.

[0] The insurers also brought a motion for relief from judgment on the grounds of newly discovered evidence pursuant to rule 60(b)(2) and/or on grounds of misconduct pursuant to Rule 60(b)(3). We need not reach this issue as the insurers will have the benefit of the "after discovered" documents at the new trial.

[0] The district court's subject matter jurisdiction was based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The jurisdiction of this court is founded upon 28 U.S.C. § 1291. As a Federal Court sitting in diversity we are bound, as was the district court, to apply the substantive law of the state whose laws govern the action. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Borse v. Pierce Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992).

18

[necessarily] cause the reversal of judgments which were correct when entered." Baker v. Outboard Marine Corp., 595 F.2d 176, 182 (3d Cir. 1979) (quoting Vandenbark, 311 U.S. at 543). However, a brief discussion of the evolution of the law in this area will focus our analysis.

## IV. New Jersey Law Before Morton.
### A. Atlantic Employers Ins. Co. v. Tots & Toddlers Pre-School Day Care Center, Inc.[0]

In Atlantic Employers, parents of children who had allegedly been sexually abused sued the owners and operators of a day care center where the abuse purportedly took place. The company that insured the center then brought a declaratory judgment action to determine its obligation to defend or indemnify the owners for any recovery the plaintiffs might win in their personal injury suits based upon negligence and intentional tort.

The day care center's insurance policy insured against damage resulting from an "occurrence." An "occurrence" included injuries or damage that was "neither expected nor intended by the insured." Atlantic Employers, 571 A.2d at 303. The policy also contained an exclusion for violations of penal statutes or ordinances. The Appellate Division first noted the general rule that "coverage does exist . . . 'for the unintended results of an intentional act, but not for damages assessed because of an injury intended to be inflicted.'" Id. (citation omitted). The court stated:

---

[0]     571 A.2d 300 (N.J. Super. Ct. App. Div.), cert. denied, 584 A.2d 218 (N.J. 1990).

> There seems to be no dispute that if, . . . Robert Knighton sexually molested the children, then he had the requisite level of intent to be found guilty of sexual molestation, based upon the criminal statutes of this State. But appellants insist that this does not necessarily mean that he intended the damages or injuries incurred by the children as a result of such actions. . . . Further, they insist that the existence of such intent cannot automatically be imputed to the other insureds under the policy so as to exclude coverage. . . . We reject this position.

Id. The court then examined cases from other jurisdictions in order to analyze the insureds' argument in context with developing law. The court noted that some jurisdictions employed a subjective test in determining insurance coverage under these circumstances, and some rely upon an objective test. The court concluded that public policy mandated an objective approach.

> As a matter of public policy and logic we conclude that the better rule warrants application of the objective approach. A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion. . . . It is simply against public policy to indemnify a person for a loss incurred as a result of his[/her] own willful wrongdoing.

Id. at 304.

### B. __Prudential Property & Casualty Ins. Co. v. Karlinski__[0]

Within a year and a half of Atlantic Employers, the Appellate Division decided Karlinski. There, insured's 13 year old son (James) had engaged in a prearranged fight with a 14 year old (Mark) in which Mark had fallen and suffered a broken hip.

---

[0]     598 A.2d 918 (N.J. Super. Ct. App. Div. 1991).

The court was asked to determine if a homeowner's policy obligated the plaintiff insurer to defend and indemnify the defendant. The policy excluded coverage for "'bodily injury . . . which is expected or intended by the insured.'" Karlinski, 598 A.2d at 919. The motion court granted the insurer's motion for summary judgment noting, that the son of the insured "'instigated the fight and threw the first blow and started the fight. As far as I am concerned, it is intentional conduct and the coverage doesn't apply.'" Id. The motion judge also concluded that "a broken 'leg' [Mark actually suffered a broken hip] was not an extraordinary consequence of the fight." Id.

On appeal the court aptly noted, "[t]his appeal requires that we again explore the frequently visited but still unclearly charted area of liability coverage for intentional torts which produce unintended results." Id. The court went on to observe:

> Our review of New Jersey authorities satisfies us that, . . . it is difficult to ascertain a clear weight of authority on the subject of liability insurance coverage for unintended results of intentional acts. Differing combinations of variables, such as the language of the exclusion clause, the nature of the harm and its relationship to the intentional act, and the availability of relief to the injured party, appear to influence the extent to which our decisions have inquired into the nature of the intent.

Id. at 921. The court then stated:

> we hold that, when a coverage exclusion is expressed in terms of bodily injury expected or intended by the insured, and where the intentional act does not have an inherent probability of causing the degree of injury actually inflicted, a factual inquiry into

21

                    the actual intent of the actor to cause that
                    injury is necessary.

Id.

     Thus, after Karlinski, a fact finder did not have to inquire
into the actual (i.e. subjective) intent of the insured unless
the damage that resulted from the insured's actions was not
inherently probable.  Accordingly, absent this improbability of
harm, the appropriate inquiry was the insured's objective intent.

## C. Voorhees v. Preferred Mutual Ins. Co.[0]

     In Voorhees, a parent was sued for statements she had made
at a public meeting questioning the competency of her child's
teacher.  The teacher claimed she had suffered emotional distress
and mental anguish as a result of the parent's conduct.  The
teacher alleged that the parent had acted "willfully,
deliberately, recklessly and negligently," in making false
accusations that had damaged the teacher professionally, and
subjected her to public ridicule.  Voorhees, 607 A.2d at 1257.
Medical evidence established that the emotional distress the
teacher complained of had resulted in "'an undue amount of
physical complaints,' including 'headaches, stomach pains,
nausea, . . . [and] body pains.'"  Id. at 1258.

     The parent had a homeowner's policy that provided coverage
for liability arising from "bodily injury" caused by an
"occurrence."  The policy defined an "occurrence" as an
"accident," and excluded coverage for bodily injury intentionally
caused by the insured.  The insurer relied upon this language and

---

[0]      **607 A.2d 1255 (N.J. 1992).**

refused to defend the insured against the teacher's suit, asserting that the claims were based on the insured's intentional act and that the complaint sought damages for a "personal" rather than a "bodily" injury. The parent eventually sued her carrier for damages resulting from its refusal to provide a defense and indemnify her. Both parties moved for summary judgment.

The trial court granted the insurer's motion ruling that the complaint did not allege the kind of "bodily injury" that would be covered under the policy. A divided panel of the Appellate division reversed.

The New Jersey Supreme Court noted that the duty to defend under the policy was not triggered "absent a potentially-coverable occurrence." Id. at 1262. In assessing whether the insured's statements constituted a potentially coverable occurrence, the court first held that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury." Id. at 1264. As to what constitutes an "intent to injure," the court noted that the general trend in the law appeared to require an inquiry into the actor's subjective intent to cause injury.

> We adhere to the prevalent New Jersey rule and hold that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is "accidental," even if the act that caused the injury was intentional. That interpretation prevents those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords

23

with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm.

Even if the operative question is the intent to injure rather than to act, the question of what constitutes an "intent to injure" remains. The key issue is whether the court must find a subjective intent to injure, or whether it can presume an intent to injure from the objective circumstances. In that regard, our inquiry parallels that taken in interpreting policy exclusions for intentional acts. Those exclusions preclude coverage for injuries expected or intended by the insured. Case law interpreting those policy exclusions, in addition to that interpreting the definition of "occurrence," is thus relevant.

The general trend appears to require an inquiry into the actor's subjective intent to cause injury. Even when the actions in question seem foolhardy and reckless, the courts have mandated an inquiry into the actor's subjective intent to cause injury.

Id. at 1264.

However, the court recognized that:
[w]hen the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind.

Id. at 1265 (citing Atlantic Employers, supra). The Voorhees court reasoned that the insured's actions were a far cry from the type of egregious behavior that justified an objective approach in Atlantic Employers. The court held that "[a]bsent exceptional circumstances that objectively establish the insured's intent to injure," the insured's subjective intent to injure must govern. Id. While the court felt that there was little evidence that the

24

insured subjectively intended or expected to injure the teacher, the court never had to address this question because the plaintiff had also alleged that the insured had acted negligently. The allegation of negligence presupposed the absence of a subjective intent to injure and stated a claim for a potentially coverable occurrence thus triggering the insurer's duty to defend. See id. Accordingly, the court affirmed plaintiff's award of summary judgment.

## D. SL Industries, Inc. v. American Motorists Ins. Co.[0]

In SL Industries, an employee had filed suit against his employer alleging age discrimination and common law fraud as a result of the employer eliminating his position. The employee sought recovery for the alleged bodily injury that resulted. The employer was insured under a policy in which the insurer agreed to defend and indemnify the employer for all sums resulting from a bodily injury caused by an "occurrence." "Occurrence" was defined as an "accident . . . which results in bodily injury . . . neither expected nor intended from the standpoint of the insured." SL Industries, 607 A.2d at 1269–70.

The employer settled the suit and then brought a declaratory judgment action against its insurer to establish its right to indemnification. The Law Division granted the insurer summary judgment, but the Appellate Division reversed, holding that although intended harm was not covered under the policy, the policy did provide coverage for the unforeseen results of

---

[0] 607 A.2d 1266 (N.J. 1992).

25

intentional conduct.  The court then remanded the case to the Law Division to determine whether the employee's emotional distress had been intended or whether it was foreseeable.

On appeal, the New Jersey Supreme Court had to determine if the general intent to injure that is inherent in a claim of fraud necessarily incorporates the intent to cause the specific injury (emotional distress), or whether proof of a subjective intent to cause the specific injury is required.  Id. at 1277-1279.  The court began its analysis of the required intent by examining the differing approaches taken by earlier cases.

> Our courts have taken different approaches to the question of how specifically the insured must have intended the resulting injury.  Employing the "Lyons" test some courts have held that a subjective intent to injure ends the inquiry and precludes coverage.  Under that approach, if there is a subjective intent to injure then any injury that results from the action will be deemed "intentional," even if the injury is different from or greater than that intended. . . .[0]
>
> On the other hand, some courts have indicated that to preclude coverage if the injury that actually occurred was not a probable outcome of the wrongful act is unfair. [citing Prudential Property & Casualty Ins. Co. v. Karlinski] . . . . However, in those circumstances in which the facts indicate that the acts in which the insured engaged were unlikely to result in the degree or type of injury that in fact occurred, an inquiry into the subjective intent to cause the resulting injury is in order.
>
> A third approach is even more likely to lead to coverage.  In Hanover Ins. Group v. Cameron, the court rejected the insurance

---

[0]    The test derives its name from Lyons v. Hartford Ins. Group, 310 A.2d 485, 488-89 (N.J. Super. Ct. App. Div. 1973).

26

company's argument that to preclude coverage only the intent to harm need be demonstrated. The court indicated that "intent" would only be found when the actual consequences that resulted from the act were intended, or when the actor was substantially certain they would result.

To determine which approach to adopt, we refer to the general principles underlying the interpretation of insurance-policy provisions involving intentional conduct.

The Lyons test . . . precludes coverage in some cases in which an insured could reasonably expect coverage. When the injury caused significantly exceeds the injury intended or expected and is an improbable consequence of the wrongful act that caused it, then it is hard to characterize the injury as truly "intentional." The injury, from the standpoint of the insured, is "accidental," and could thus be deemed an occurrence. Moreover, if the tortfeasor did not intend or expect to cause the resulting harm, denying coverage will not deter the harmful conduct. In that case, there is no policy justification for denying the victim the possibility of additional compensation. As the Karlinski court noted, precluding coverage "even if the actual harm far exceed[s] the consequences which might reasonably be expected by the insured . . . diminishes the injured party's realistic possibility of recovery more than it impacts upon the insured tortfeasor."

On the other hand, an approach allowing coverage whenever the adverse consequences intended by the tortfeasor did not precisely match the actual consequences of their wrongful actions undermines the basic policy against indemnifying wrongdoers.

We believe the Karlinski test presents the most reasonable approach. . . . Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury

27

> was "accidental" and coverage will be provided.

Id. at 1277-78 (citations omitted).

Accordingly, the court affirmed the Appellate Division's judgment remanding the case to the Law Division to determine whether the employee's emotional distress had been a probable outcome of the insured's general intent to injure, and if not, whether the insured subjectively had intended to cause the employee's actual injuries.  See id. at 1279.

## V. **Morton Int'l, Inc. v. General Accident Ins. Co.**[0]

In Morton, the New Jersey Supreme Court had to apply the evolving law of occurrence based insurance policies to injuries to the environment.  There, the insured, Morton International, sue_"

---

[0] **629 A.2d 831 (N.J. 1993), cert. denied, 114 S.Ct. 2764 (1994).**

28